**Commonwealth, by, etc. v. Union Pacific Railroad Company.**

**Commonwealth, by, etc. v. Canadian Pacific Railroad Company.**

**Commonwealth, by, etc. v. Chicago, Milwaukee & St. Paul Railroad Company.**

**Commonwealth, by, etc. v. Atchison, Topeka & Santa Fe Railroad Company.**

(Decided May 7, 1926.)

Appeals from Jefferson Circuit Court
(Common Pleas, First, Second and Third Divisions).

1. Taxation—State, in Exercising its Right to Tax, Exercises Attributes of Sovereignty, and May Tax Only Things and Persons Subject Thereto.—In exercising its right to tax, state is exercising one

of its attributes of sovereignty, and may tax only those persons and things subject to its sovereignty.

2.  Licenses—Taxation—State May Levy Personal Tax on Persons Subject to its Jurisdiction, Property Tax on Property Within Territory, and License Tax on Acts Done Therein.—State may levy personal tax on persons subject to its jurisdiction and sovereignty, property tax on all property located in its territory and license tax on all acts done therein.

3.  Taxation.—Personal tax may be imposed on all domiciled within territories of state, whether he be citizen, alien or corporation.

4.  Taxation.—Personal tax may not be imposed on person or corporation not domiciled within territory of state.

5.  Taxation—Power to Tax Railroads, Not Resident of or Domiciled in State on Freight Cars Belonging to Them and Used Within State Cannot be Rested on Right to Impose Personal Tax.—Power to tax railroads which are not resident of or domiciled within state on freight cars belonging to them and used within state, cannot be rested on right to impose personal tax.

6.  Taxation.—Chattel temporarily in state is not subject to ordinary property tax, though sovereign has jurisdiction over every chattel situated within its territory.

7.  Taxation—Real and Personal Property is Not Subject to Taxation, Unless it has Situs for Taxation Within State (Constitution, Sections 171, 172, 174; Kentucky Statutes, Section 4020).—Constitution sections 171, 172, 174, and Kentucky Statutes, section 4020, requiring that all real and personal estate shall be subject to taxation held not to mean that such property shall be subject to taxation unless it has a situs for taxation within state.

8.  Taxation.—Chattels transiently present in transactions of commercial operations or but temporarily located within state do not generally acquire taxing situs within state.

9.  Taxation—Freight Cars of Foreign Railroads, Used to Carry Freight on Connecting Carrier Line for Shippers' Convenience, Held Not Subject to Taxation Within State, Not Having Acquired Taxable Situs.—Freight cars of foreign railroads, sent into state temporarily for purpose of carrying freight on other freight lines for convenience of shipper held not taxable in state.

10. Taxation.—Foreign railroad, owning no property and doing no business within state, is not liable for franchise tax because its cars are frequently transported over railroads in state.

J. MATT CHILTON, County Attorney, J. VAN NORMAN, GORDON & LAURENT, D. L. HAZELRIGG and FRANK E. DAUGHERTY, Attorney General, for appellant.

JAMES P. HELM, JR., TRABUE, DOOLAN, HELM & HELM and EDMUND F. TRABUE for appellee Union Pacific Ry. Co.

HELM BRUCE and BRUCE & BULLITT for appellee Canadian Pacific Railway Co.

CHARLES G. MIDDLETON and HUMPHREY, CRAWFORD & MIDDLETON for appellees, Chicago, M. & St. P. Ry. Co., and Atchison,

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

The four above styled cases were begun by the Commonwealth of Kentucky through its revenue agent against the respective appellees herein in the county court of Jefferson county. They are four of a large number of suits begun at the same time against various nonresident railroad companies who own or lease no tracks and operate no lines within this Commonwealth. The purpose of these suits was, first, to have assessed for taxation, as omitted property for the years set out in the respective statements, freight cars of these foreign railroads which had been let or hired by them under what is commonly called the "per diem freight car arrangement" to railroads owning and operating lines within this state. To this end, the statements, in substance, averred that during the years in question these foreign railroads had let or hired for profit, and at the rate of 45 cents or better per day per car, under this "per diem freight car arrangement" a large number of their freight cars to these domestic railroad companies, to be by the latter used on their lines in this state, and which were so used by such domestic railroad companies. The statements further averred that, although the cars and number of cars so let and used varied from day to day during the stated period, yet continuously during that time there had been an average number of such cars so let and so used, which number and their value were set out for each of the years covered by the suits. It was this average number which the Commonwealth sought to have assessed for taxation. The next purpose of these suits was to have assessed against these foreign railroad companies, for the same years as it was sought to assess their freight cars, a franchise tax on their intangible property and earnings, in addition to the tax sought on the freight cars. The theory of the Commonwealth, in this regard, as set out in these statements, was that, by letting and hiring their freight cars for profit to the domestic railroads as above set out, these foreign railroads were exercising a special privilege not allowed by law to natural persons, and enjoying large earnings, for both of which they should pay the franchise tax therein sought.

Each of the defendant roads demurred to these statements in the county court. The demurrers being overruled, they filed their respective answers. After proof

heard, the county court awarded the Commonwealth the relief it sought. By agreement, the four cases now before us were appealed as test cases to the circuit court, the other cases to abide the result in these four. One of these four cases fell to First division of the common pleas branch of the Jefferson circuit court. The other three fell to the Second and Third divisions, because the county judge who had decided these cases in the county court had in the meantime been elected to the judgeship of the Fourth division.

In the circuit court, the present appellees renewed their demurrers to the statements. In the Canadian Pacific Railway Company case, *supra,* which fell to the First division, the demurrer was sustained, and the Commonwealth declining to plead further, its statement was dismissed, and it brought this appeal in that case. In the other three cases the demurrers were overruled, and, on the issues raised by the answers, the court heard proof. On submission, being of the opinion that the Commonwealth had failed to prove any average number of cars as being within this state for any of the years in question, the Second and Third divisions dismissed the statements of the Commonwealth. A motion for a new trial on the ground that, if given further opprtunity, the Commonwealth could prove with reasonable certainty and at a reasonable cost such average number, having been overruled, the Commonwealth brought these appeals in these other three cases.

In exercising its right to tax, the state is exercising one of its attributes of sovereignty. It follows then that the state may tax only those persons and those things which are subject to its sovereignty. As said by Justice Field in State Tax on Foreign Held Bonds, 15 Wall. 300:

"The power of taxation, however vast in its character and searching in its extent, is necessarily limited to subjects within the jurisdiction of the state. These subjects are persons, property and business."

Chief Justice Marshall, in McCulloch v. Maryland, 4 Wheat. 316, expressed the thought in these words:

"All subjects over which the sovereign power of a state extends, are objects of taxation; but those

over which it does not extend are, upon the soundest principles, exempt from taxation."

And in the recent case of Rhode Island Hospital Trust Company V. Doughton, 46 S. Ct. 256, 70 L. Ed. —, Supreme Court Rep. — U. S. —, Chief Justice Taft stated the same prinicple in these words:

"It goes without saying that a state may not tax property which is not within its territorial jurisdiction."

Abundant authority was cited to support this statement.

Obedient to this principle, a state may lay a personal tax upon persons subject to the jurisdiction of its sovereignty, a property tax upon all property located within its territories, and a license tax upon all acts done therein.

A personal tax may be imposed upon all domiciled within the territories of the state, whether he be a citizen, an alien, or even a corporation. This tax, as well said in the case of State v. Ross, 23 N. J. L. 517, is:

"The burden imposed by government upon its own citizens for the benefits which that government affords by its protection and its laws."

Illustrative of such a tax is a poll tax. A personal tax, however, may not be imposed upon a person or corporation not domiciled within the territory of the state. Thus in Dewey v. Des Moines, 173 U. S. 193, the facts were: Dewey, a resident of and domiciled in Illinois, was the owner of a lot in Des Moines, Iowa, upon which a lien for the cost of a street improvement was imposed. Under the provisions of the Iowa law, not only did the construction of the street create a lien against the abutting property for its cost, but it also created a personal liability against the owner of such property, even though he were neither domiciled nor present in Iowa. The question was whether or not Dewey could be thus charged with personal liability. The Supreme Court of the United States held that he could not, saying:

"The state may provide for the sale of the property upon which the assessment is laid, but it cannot under any guise or pretense proceed farther and impose a personal liability upon a nonresident to pay the assessment or any part of it. . . . The

jurisdiction to tax exists only in regard to persons and property or upon the business done within the state, and such jurisdiction cannot be enlarged by reason of a statute which assumes to make a non-resident personally liable to pay a tax of the nature of the one in question.''

As none of the railroads in any of the cases before us is or ever was a resident of or domiciled in this state, the power to tax here claimed cannot be rested on the right to impose a personal tax. If valid it must be justified as a property tax upon property located within the territory of the state.

Now while the sovereign has jurisdiction of every chattel situated within its territory, although the owner may be domiciled elsewhere, not every chattel which happens to be so situated can be regarded as having a taxable situs there. A chattel merely temporarily within the limits is not subject to the ordinary property tax. This principle was followed in Semple v. Commonwealth, 181 Ky. 675, 205 S. W. 789, wherein, among other things, it was sought to assess a small amount of furniture, an automobile and a bank account owned by Semple, who was domiciled in Texas, but which he had in Kentucky for his personal convenience and comfort while temporarily sojourning in the City of Louisville. We said:

"In order that personal property may have a situs for taxation in a locality different from the domicile of its owner, such personal property must be permanently located at the place where it is sought to be taxed. No temporary location will alter its situs for taxation at a place other than the residence of its owner."

Bearing on the same proposition, Judge Sanford, then a district judge but now a member of the Supreme Court, in his opinion in the case of Tamble v. Pullman Company, which was adopted as the opinion of the Circuit Court of Appeals for the Sixth Circuit when that case was before it on appeal, being then reported in 207 Fed. 30, said:

"The mere fact that property of a foreign corporation is in a state on a given date does not of itself give it a taxable situs there, when it has not come to rest within the state for a definite time so

as to become part of the general mass of property of the state and acquire an actual situs for taxation.''

See also Kelley v. Rhoads, 188 U. S. 1 (sheep driven across the state) ; Hays v. Pacific Mail S. S. Co., 17 How. 596 (steamship at port of call) ; Grant v. Jones, 39 Ohio St. 506 (stock of goods carried by traveling peddler) ; Robinson v. Longley, 18 Nev. 71, 1 Pac. 377 (travelling circus). Compare Pittsburgh Coal Co. v. Bates, 156 U. S. 577; Ayer, etc., Tie Co. v. Kentucky, 202 U. S. 409.

The underlying reason for the rule that a chattel merely temporarily within the limits of the state is not subject to the ordinary *ad valorem* tax of such state is that the protection from the state required by such chattel is for such a short time that to make it stand a full *ad valorem* tax which is ordinarily exacted for protection for a much longer period would be grossly unfair.

It is in the light of the foregoing principles that sections 171, 172 and 174 of our Constitution and section 4020 of our statutes must be read and understood. While they, in substance, required that:

''All real and personal estate within this state . . . shall be subject to taxation,''

they cannot mean that such property shall be subject to taxation unless it has a situs for taxation within the state.

As we have seen, chattels ''transiently present in the transactions of commercial operations'' or but temporarily located within the state, do not as a general proposition acquire a situs for taxation within such state. However, if the resident of one state brings or sends his property into another state to use and employ it permanently there, it is settled that such property must bear its fair share of the burden of taxation, although no one unit of such property is ever more than temporarily located within the taxing state. The shifting units but take the place of each other, and the property as a whole receives the state's protecting care. Even as the hive is the hive, though the bees of the spring have long since been replaced by the bees of the summer and these by the bees of the fall, so the property is the property, though its units have changed many times in the course of the year. But, in the nature of things, there must be some cohesive principle which brings together the changing

and shifting units so that we see the whole and not its parts. We have seen that the mere temporary presence of the chattel does not give the state the power to tax it. What is it that makes the mass of which it is a part taxable when it itself is not taxable? Is it not the fact that the owner is using and employing them *together* as parts of a whole, which whole receives the protection of the state, that gives the state the right to tax them, not as units but as a whole? That this is true seems clear to us, and our conclusions are fortified by the opinions of the Supreme Court in passing on the right of the states to tax tank cars, refrigerator cars, Pullman cars and cars of like character owned by nonresident companies but present in average number within such state throughout the taxing period. Thus in American Refrigerator Transit Co. v. Hall, 174 U. S. 70, at page 82, it is said:

"Where a corporation of one state brings into another, *to use and employ,* a portion of its movable personal property, it is legitimate for the latter to impose upon such property, *thus used and employed,* its fair share of the burdens of taxation imposed upon similar property used in like way by its own citizens."

In Union Tank Line v. Wright, 249. U. S. 275, the court said:

"In so far, however, as movables *are regularly and habitually used and employed therein,* they may be taxed by the state according to their fair value along with other property subject to its jurisdiction, although devoted to interstate commerce."

In the case of City of Covington v. Pullman Company, 121 Ky. 218, 89 S. W. 116, the same thought was expressed, and in the case of Baltimore & Ohio R. Co. v. Commonwealth, 177 Ky. 566, 198 S. W. 35, involving the same principle, we said:

"It has also been settled by the United States Supreme Court that engines and cars of a railroad company coming into a state continuously *in the regular course of business* may be taxed in that state, although no one of the engines or cars so coming into the state may remain in the state a sufficient length of time to give any particular engines or cars a situs in the state for taxation."

Are the freight cars of these foreign railroads and the way in which they are used in this state comparable to these tank line cars and the way in which they are used? Is the cohesive principle here present as it is there?

From the statements in these cases and from facts judicially known as matters of common knowledge, it appears that these foreign railroads derive no revenue from the use of their cars in this state by the domestic roads other than the per diem allowance of 45 to 75 cents a day, as the case may be. If the cars be filled with freight, the freight revenue goes to the road which moves it. If empty their movement is at the expense of the road which has possession of the cars. In the early history of railroading, the cars of a railroad seldom left the line of their own road, and freight had to be transferred at each junction point. To obviate the nuisance of transferring the freight so often, car line companies then arose, such as the "Merchants' Dispatch." Finally the carriers, by voluntary arrangement, made through routings, and now by federal law are compelled to do so. Although the statements in these cases aver that these foreign railroads let "for profit" the cars here in question to the domestic roads, yet these same statements set out the amount of the per diem per car—45 to 75 cents—and the value of such cars. In the light of such averments, it is obvious that the per diem allowance stated can result in but little, if any, profit to the owning road. When it is considered that out of this per diem allowance must come the depreciation, taxes paid under the unit rule, hereinafter mentioned, interest on the investment, and the car's fair share of the overhead of the owning road, little is left for any profit, though the per diem allowance be paid for each day of the calendar or taxable year. It is plain that this small per diem allowance is designed to compensate the owning road for these items and not to make a profit for the owning road. In no just or exact sense within the scope of the cohesive principle can it be said that the foreign railroads either send, use or employ any portion of their freight cars in this state. It is the business of the tank line, refrigerator, Pullman car and like companies to send directly or through their lessees their equipment into the various states of the Union for the purpose of carrying goods. These companies own no line of track and their equipment, which they lease or

otherwise employ, would be of no value, and would serve no purpose of the company unless and until sent out over the lines of various railroads in the prosecution of the carrying business. A railroad freight car, however, is primarily designed for the use of the owning carrier on its own line. It is not sent by its owner onto the line of another carrier in the prosecution of its owner's business, which is to carry freight on the line of such owner. It is sent onto the line of the connecting carrier for the convenience of the shipper, and because the United States government requires railroads to do so in through routing. The tank line and like companies receive a substantial profit from the use of their cars when in the foreign states, or at least their cars are so employed or used in the effort to make such profit. But the railroads do not send their cars into other states in the effort to make any profit from them while there. The foreign railroads are not doing business in such states as are the tank line and like companies. Although the freight cars of the foreign railroads are present in this state from time to time, yet each one is but temporarily so, and the cohesive principle which brings changing units together to form a whole which may be taxed—that is, the use and employment of them together as a whole by the owner in the prosecution of some purpose of his, usually business —is absent. As truly said by Justice Holmes in New York Central Railroad v. Miller, 202 U. S. 584, at page 597, these foreign freight cars come into this state on "random excursions of casually chosen cars, determined by the varying orders of particular shippers and the arbitrary convenience of other roads." No business, no purpose of the owning road, is served by their presence here. The cohesive principle being then lacking, we have then only chattels temporarily present within the state, which such chattels this state may not tax and which its Constitution and statutes, when correctly construed as applying only to property having a taxable situs in this state, do not require us to tax.

In its practical workings, the distinction between the situs for taxation of the cars of the tank line and like companies and that of the cars of these foreign railroads we have thus pointed out, works no injustice and allows no property to escape from paying to some sovereignty its fair burden of taxation. As is conceded by the parties, almost every state, if not all the states of the Union,

has adopted the "unit rule" when it has come to tax the rolling stock of railroads owning or operating lines within its territory. As applied to rolling stock, the unit rule is this: So much of the entire rolling stock of the railroad is regarded as having a taxable situs in the state as is represented by the proportion found by taking the miles of lines of the railroad in the state and comparing them to the total miles of lines of such railroad. To illustrate: A railroad operates 4,000 miles of lines, 1,000 of which lie within the particular state. It has, say, 20,000 cars. As one-fourth of its mileage is in such state, 5,000 of its cars are regarded as having a taxable situs there. In its generality, the unit rule of taxation as applied to railroads has been upheld by the Supreme Court, Ky. R. R. tax cases, 115 U. S. 321, and although it has in particular instances been disregarded where its practical workings is shown to result in injustice, Fargo v. Hart, 193 U. S. 490; Davis, Director General v. Wallace, 257 U. S. 478, yet unless such injustice be plainly shown, it will, if applied, be upheld. Under this rule, each car of the railroad is taxed once by some state in which the railroad runs. If the state fails to tax the cars of foreign roads found on domestic lines, yet it taxes the cars of domestic lines which are off on foreign roads, and, in the long run, the interchange of cars will, as a practical matter, bring about a balance between such numbers. If the cars of the domestic line acquire no taxable situs elsewhere than in the state or states where their owner is operating its lines, then they may be taxable in such state or states. New York Central R. R. v. Miller *supra.* And they do not acquire such taxable situs elsewhere under the circumstances disclosed in this case, as we have seen.

On the other hand, tank line and like companies have no lines of road over which their cars run, so as to enable the state to apply the unit rule to them. If the cars be permanently absent from the domicile of their owner, they may not be taxed there. Union Refrigerator Transit Co. v. Kentucky, 199 U. S. 194. But such companies are enjoying the protection of the states into which their property goes in the prosecution of the business and purposes of such companies, and, unless they pay their share of the burden of taxation there, they will escape all taxation. By requiring them to pay to the state on the average number of cars they there maintain, employ and use in the prosecution of their business and purposes, we arrive at the same result as we do in the case of the rail-

roads; that is, each car of the tank line and like companies pays to some state its share of the burden of taxes.

It would seem, then, that if the application of the unit rule to the rolling stock of railroads and that of what we shall call, for want of a better name "the average number of cars" rule to the rolling stock of the tank line and like companies work out to the same end, that each piece of such rolling stock pays to some state its fair share of taxes, that the distinction between the two we have worked out in principle bears unscathed the test of experience.

From what we have said, it results that these foreign owned railroad cars and had no situs for taxation in Kentucky during any of the years set out in the statement. If this be so, it then follows that, as these foreign railroads owned no property and did no business within this state during any of these years, they are not liable for the franchise tax here sought to be imposed. This proposition was thoroughly worked out in Commonwealth v. Lee Line Co., 159 Ky. 476, 167 S. W. 409, and need not be demonstrated again.

The lower court then, which sustained the demurrer to the statement of the Commonwealth, committed no error, and its judgment is affirmed. With reference to the other three appeals, although the courts in these cases overruled the demurrers and heard proof, yet, as they dismissed the statement of the appellant in each case, they arrived at the same result as would have been reached had the courts taken the same action as did the court in the other case. Their judgments are therefore affirmed. Cf. Decker v. Kentucky Coke Co., 211 Ky. 66, 276 S. W. 1092.

Judgment affirmed in each case. Whole court sitting and concurring.