## Cumberland Pipe Line Co. et al. v. Commonwealth ex rel. Sheriff of Estill County.

(Decided Dec. 21, 1934.)

CRAWFORD & HARRIS. E. C. O'REAR, ALLEN PREWITT, CRAWFORD, MIDDLETON, MILNER & SEELBACH, E. L. McDONALD, GEORGE W. VAUGHN and JOUETT & METCALF for appellants.

H. D. KREMER for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

This suit is by the commonwealth, on relation of the sheriff of Estill county, to recover taxes on crude petroleum in certain tanks which was not assessed in that county for the years 1925 to 1930, both inclusive. Judgment was rendered against the appellants, Cumberland Pipe Line Company, the Standard Oil Company of Kentucky, the Ashland Refining Company, the Tri-State Refining Company, the New Domain Oil & Gas Company, and McEldowney and Bowser. The major part of the judgment is against the Pipe Line Company and is based upon its relation as bailee in possession. The Cumberland Pipe Line Company, by its charter and the statutes (section 3766b-1b, Ky. Stats.), is a common carrier engaged in the transportation of oil. It has in this state approximately 200 miles of main line and 200 miles of parallel or double line. In connection with the lines of pipe are numerous tanks for gathering oil at the wells, thence to be carried into larger tanks from which it goes into transmission. During the time involved the company served five oil fields

with about 6,000 wells, and its lines passed through fourteen counties of the state and many lesser taxing districts. Close to 17,000,000 barrels of oil were handled by this company during the six years. The flow or transportation was altogether toward the east and northeast from Estill county. By far the greater part of the oil was received from wells along the line east of that county, and it was as a matter of fact never in that county. But the company had at Fitchburg, Estill county, five large tanks with an aggregate capacity of 195,000 barrels, into which it had run oil from wells in Estill and Jackson counties south and west of the tanks. The quantity there on each of the taxing dates was as follows: July 1, 1925, 79455.67 barrels; July 1, 1926, 75933.54 barrels; July 1, 1927, 75456.63 barrels; July 1, 1928, 106864.84 barrels; July 1 ,1929, 125728.58 barrels; and July 1, 1930, 188661.91 barrels.

It will be observed that during the first three years the contents were about the same. Between the first and last taxing dates there was actually withdrawn only 8,057 barrels. Deducting that from the quantity at the beginning of the period, 79,455 barrels, it may well be said that 71,398 barrels of the same oil were there throughout the period and on each of the assessing days. On each of the last three dates there was a large increase in the quantity. The trial court held that oil in the "working tanks," which appear to have been intermediate of the gathering tanks and the trunk line and also connected with these larger tanks, had only a temporary situs in the county and was not assessable. Influenced by the tariff and rule of the Pipe Line Company with respect to making a charge for delay of 60 days and more in calling for delivery of oil committed to it (which appellee maintains was a storage charge), the trial court held that oil there on July 1st must have been in the tanks at least the whole of June and a portion of May in order to have established a taxable situs on July 1st. Upon this hypothesis and eliminating the working tanks, the following quantities and values were adjudged taxable:

66,228 barrels at $2.45 a barrel, as of July 1, 1925.
62,313 barrels at $2.50 a barrel, July 1, 1926.
60,190 barrels at $1.50 a barrel, July 1, 1927.
91,488 barrels at $1.55 a barrel, July 1, 1928.
108,981 barrels at $1.80 a barrel, July 1, 1929.
171,384 barrels at $1.30 a barrel, July 1, 1930.

It was ordered that these assessments should be made, and judgment was rendered against the defendants for the state and county school district taxes for each year, plus 6 per cent. interest and 20 per cent. penalty.

The judgment rests upon the idea that in respect to this oil the Pipe Line Company was a warehouseman and liable for the taxes as a bailee in possession, and with the conception that all owners of the oil throughout its entire system were tenants in common and as such owned a proportionate part. Since the quantities owned by the five defendants were disclosed, it was ascertained what fractional part of the whole volume each owned, and that ratio was applied to the quantity in the Fitchburg tanks to measure each company's share of it. Deducting that owned by these five companies, the balance was assessed against the Pipe Line Company.

It would appear necessary for an understanding of the difficulties encountered in making an assessment of this property for taxation, of the division of the tax among the defendants, and to some extent as a reason for our conclusion respecting the whole matter, that a brief general outline should be given of the methods by which the oil was handled by the Pipe Line Company.

The means and facilities of transportation are by force pumps, pipe, and tanks. From the wells the oil went into tanks belonging to the producers. It was there measured and recorded on a "run ticket." There was first deducted the state and county production tax (section 4223c-1 et seq.), and the balance was credited proportionately to the owners of the royalty and operating owners or others having an interest in the oil as had been reported to the company. From the producers' tanks the oil was gathered into one or more relatively small "working tanks," out of which it was pumped through the lines in the course of normal transportation. Upon receipt of the "run ticket" at the office of the company, each of the owners of the oil or an interest therein was credited on the books with his share. When notified of a sale by him, his account was charged and his purchaser was given the credit. The balance to the owner's credit was designated as a "credit balance." There were from 2,800 to 3,500 of these accounts on what was called the "Producer's Oil

Books." These sales by producers, i. e., those among whom the "run tickets" were divided, were evidenced by a form called "sales orders" or "purchase order forms." They were usually signed in blank and undated. When the purchaser desired a transfer of the oil made to his account, he would fill in the amount and date the certificate. Sometimes he would communicate with the Pipe Line Company to ascertain what the seller had to his credit on a particular date. It appears that these certificates were floating around in the market, being passed by assignment. Upon the receipt of such an order, a transfer of the credit balance was then made on the books of the company. In a large number of instances these "sales orders" were received days and weeks later. So it was not possible, because of this practice or custom of the trade, for the company's books to show on July 1st, or any other given date, who were the owners of these "credit balances," the aggregate of which represented the oil in its possession. These various division orders or signed directions for distribution of the oil received from the producer's tanks, as evidenced by the run tickets, and those evidences of quantity, together with the tariffs of the company, filed with and approved by the Interstate Commerce Commission, in the main constituted the contracts between the Pipe Line Company and its patrons.

When oil is delivered to the Pipe Line Company, it is by necessity mingled with other oil so that the specific commodity cannot be returned or delivered. The owner is only entitled to receive oil of like kind and quality from the common stock. No consignee is named when the oil is delivered to the Pipe Line Company, and, as we have stated, the certificates of ownership pass by assignment, of which the carrier knows nothing until they are presented to be honored by delivery of the oil. The oil is pumped from one tank to another and from one county to another without consulting the owners. Consequently, nobody knows where his identical oil or his undivided portion of the whole is located. The system or method of transportation is for the owner of a credit balance when he wishes delivery to give to the Pipe Line Company what is styled a "shipping order," or, in interstate transportation, a "tender of shipment." This instrument calls for delivery of the designated quantity at some point on the

line. All this is in accordance with the contract for transportation, particularly with the tariffs. The carrier is compelled to accept oil for transportation (at least to the extent of its reasonable facilities) and to deliver it upon the order of the consignor (unless prevented by order of court), and may be subject to damages or perhaps a criminal penalty for refusal. Section 3766b-1a, Kentucky Statutes; L. & N. Rd. v. Higdon, 149 Ky. 321, 148 S. W. 26, Aff. 234 U. S. 592, 34 S. Ct. 948, 58 L. Ed. 1484; Hall v. Cumberland Pipe Line Co., 193 Ky. 728, 237 S. W. 405; Willis' Thornton on Oil & Gas, sec. 754.

Our scheme of government demands that all property shall pay its fair share of the governmental cost, save only that which is expressly exempt because it is public or quasi public property or serves the general welfare. The Constitution, sec. 172, requires that. Section 4020, Kentucky Statutes, provides that "all real and personal estate within this state * * * shall be subject to taxation unless the same be exempt from taxation by the Constitution. * * *" Various methods have been evolved by the several statutes to the end that none shall escape this contribution and that it shall be conveniently and economically collected. Differences in the methods are made necessary by differences in the character of property, e. g. railroad trunk lines are different from farms, realty from personalty, and tangibles from intangibles. As a part of that protective scheme, and to insure that taxes shall be paid upon all property, we have sections 4023 and 4052 of the Statutes pertaining to bailees in possession generally, and section 4777a-1 pertaining to warehousemen or property held in storage (also section 4780a-1 et seq., as to oil warehousemen), all of which require that such bailees shall return property of others in their possession for taxation and shall be liable for the payment of taxes thereon.

But under the superior control of the federal government, states and their subdivisions may not levy a tax on property moving in interstate commerce. Property in possession of common carriers in transit is universally regarded as not being taxable, at least as against the carrier. Such has been the uniform regard in this state with respect to railroads and express companies, notwithstanding the broad and emphatic lan-

guage of sections 4023 and 4052 of the Statutes, which may well be quoted for convenient reference:

Section 4023 is as follows:

"The holder of the legal title, and the holder of the equitable title, and the claimant or bailee in possession of the property on the first day of July of the year the assessment is made, shall be liable for taxes thereon; but, as between themselves it shall be the duty of the holder of the equitable title to list the property and pay the taxes thereon, whether the property be in possession or not at the time of the payment."

Section 4052 is as follows:

"All taxable estate shall be assessed and valued as of the first day of July in the year listed, and the person owning or possessing same on that day shall list it with the assessor, and remain bound for the tax, notwithstanding he may have sold or parted with the same."

A companion statute is section 4033, which gives the bailee, if he shall pay the taxes, the right to recover the amount from the owner, and a lien on the property as security. Imposition of liability for assessing and paying taxes upon the property of another held in possession goes back at least as far as 1880. Section 4, art. 4, and section 11, art. 5, c. 92, General Statutes; Commonwealth v. Gaines, 80 Ky. 489. The current statutes, section 4023 and 4052, are in substantially the same language as appeared in an act of 1886 covering the matter of taxation or various classes of property and virtually inaugurating a new taxation scheme with special machinery set up for taxing railroad companies, express companies, telegraph and telephone companies, and banks, which plans materially differ from that provided for other properties and taxpayers. These sections which place the burden upon bailees of seeing that the property in their possession is taxed are in the chapter of the act and subsequently published laws dealing with taxation of property not covered by those specific methods. It has been held that those sections are not applicable to banking institutions in so far as the property of their depositors as such is concerned. Deposit Bank of Owensboro v. Daviess County, 102 Ky. 214, 39 S. W. 1030, 19 Ky. Law Rep. 248, 44 L. R. A.

825; Commonwealth v. Bank of Commerce, 118 Ky. 547, 81 S. W. 679, 26 Ky. Law Rep. 407. These distinctive systems or methods of taxation have been maintained since 1886. At the time of their adoption, pipe line companies as common carriers were unknown. Subsequently legislation was passed dealing with them, and particularily in the matter of taxation they were given a special classification. In 1922, section 4114i-11 was enacted. This gives the State Tax Commission exclusive power to assess property of pipe line companies and otherwise provides a system of taxation different from the general taxpayer. Nothing is said in this legislation about assessing property as a baillee in possession. By an amendment in 1926 (Laws 1926, c. 75), pipe line companies were included within the provisions of section 4077 as public service corporations, and franchise taxes have since been exacted of them. In effect, throughout the legislation, these carriers are treated as are railroad companies. All of this and the judicial construction in respect to banks is submitted in argument as showing that it was never intended that pipe line companies should come within the embrace of these bailee laws. It is proved in this record that such has been the contemporary construction by the taxing authorities of the State.

Fortifying this argument is that which points out the impossibility of making application of the bailee-in-possession statutes on account of the nature of the business; the commingling of oil; the freedom from assessment because part of it is moving in interstate commerce; the location among many taxing districts; the diversity of ownership with a consequent infinitesimal tax in many instances; the necessary ignorance by the carrier as to the ownership on any specific assessing date; the inability of collecting the tax from those of record on that date; and the enforcement of a lien to secure reimbursement, because of lapse of many months after assessment before the rate of taxation is fixed, and the still longer period before payment is made. All of these reasons, and others which may be conceived, have doubtless influenced the general conclusion of the courts that oil in pipe lines is not taxable. So far as oil in actual transit is involved and so far as a carrier is concerned, we must subscribe to that conclusion. Such was the opinion of the trial court.

The case is really resolved into the question whether the oil in the Fitchburg tanks occupied that status of being in transit or was merely in storage and in possession of the Pipe Line Company in the capacity of a warehouseman and when it was not functioning as a common carrier. A "warehouseman" is defined by section 4768, Statutes, to be any person or corporation who shall receive any property or undertake to receive or take care of same with or without compensation or reward therefor. The judgment rests upon the conception that the oil was at rest and in storage rather than in transportation. If the oil was in fact so held, it was plainly the duty of the company to assess the oil and pay the taxes under the several statutes to which we have referred.

Prior to 1923, the Pipe Line Company was expressly engaged in the business of storing oil as well as transportation. It insists that it then went out of that business. At that time its tariffs were changed to limit its activities solely to that of transportation. These tariffs were approved by the Interstate Commerce Commission, and a violation would subject the company to penalties. The tariffs, however, provide that the company could make a charge of 5 cents a barrel per month for oil not withdrawn within sixty days. The company calls this a penalty for "delay in giving shipping orders," and maintains that it was and may be imposed in order to induce early acceptance of oil delivered to it for shipment. As a matter of fact, the larger shippers or purchasers of credit balances never delayed acceptance and were not penalized during the period involved. The evidence shows the imposition of only a comparatively negligible charge and that evidence, it may be said in passing, was not of a very substantial nature.

It was the contention of the Pipe Line Company, and its voluminous proof tends to show, that the oil in the Fitchburg tanks accumulated through congestion in traffic and an inability of its patrons to take care of the production at destination, and expressly an inability or failure of connecting carriers upon which this company was dependent in many cases for delivery to the consignees. The fields served during the period produced large quantities which the company was bound to accept to the extent of its facilities. It endeavored

strenuously to effect deliveries. These tanks were merely depots or stations holding the oil until it could be moved or delivered, and it is maintained that the contents were constructively in actual transportation. It is shown that the company might well have avoided all ideas of storage by changing what seemed to be comparatively constant contents by emptying the tanks into the moving stream and refilling them, which it is obvious would have been useless procedure. The charge of "delay in giving shipping orders," it is shown or at least declared, is in all respects analogous to demurrage charges of railroad transportation companies. See 10 C. J. 464; Kentucky Wagon Mfg. Co. v. Ohio & Mississippi Railway Co., 98 Ky. 152, 32 S. W. 595, 17 Ky. Law Rep. 726, 36 L. R. A. 850, 56 Am. St. Rep. 326; Louisville & N. R. Co. v. A. Waller & Co., 154 Ky. 811, 159 S. W. 590.

The contention of the commonwealth is that the company provided the several groups of large tanks adjacent to its lines for storage purposes and none other. This is based upon a deduction from the facts, that though it claimed to have gone out of the storage business in 1923, and changed its tariffs to indicate that fact by calling the same charges for "delay in giving shipping orders" instead of storage charges, yet it had built five large tanks in 1924 and 1925, and its pipe line runs were diminishing each year. Further, that the difficulty of subjecting the property to lien or protecting itself or of recovering taxes paid disappears under the presumption which generally obtains that the consignor of a shipment is the owner of goods until the carrier is notified otherwise. If it was liable, the fact that it could not now recover because the goods in possesson on the respective assessing dates have long since passed out of its possession would appear to be no defense (section 4052, Ky. Stat.; Commonwealth v. Riley's Curators, 115 Ky. 140, 72 S. W. 809, 24 Ky. Law Rep. 2005; Commonwealth v. Rosenfield Brothers & Co., 118 Ky. 374, 80 S. W. 1178, 82 S. W. 433, 25 Ky. Law Rep. 2229, 26 Ky. Law Rep. 726); but as a matter of fact many of the same owners had credit balances with the company continuously thereafter.

The trial court found that the Pipe Line Company was engaged primarily in the business of carrying oil

ana incidentally in the business of storing it for its patrons for hire, even though but little was actually charged or collected. Nevertheless, it found as a fact that:

> "The defendant, Cumberland Pipe Line Company, was reasonably equipped with facilities for receiving, handling and transmitting the oil consigned to it, and any failure on its part to do so as rapidly as said oil was received by it was due to transportation difficulties incident to such business, and to the inability or failure of connecting carriers to receive from the Cumberland Pipe Line Company the oil transmitted by it to its terminal points and thereby relieve the Cumberland lines and pipes of their oil content, so as to allow other oil back of points of delivery to flow to and out of the pipes at terminal points. This condition resulted in congestion of oil in defendants' pipe lines. Such oil as was put and kept in the Fitchburg tanks named was to allow the carrier to receive oil from wells as pumped out of them, though not capable of being moved on immediately because of the inability of its connecting carriers to take the oil as rapidly as it flowed in."

The court further declared that it was expected by the Pipe Line Company and its patrons that oil delivered to it would be shipped expeditiously or before the date when charges for delay in shipment first became chargeable. The fault for the delay therefore was fixed upon the owners and not on the carrier.

The conclusion of taxability seems inconsistent with the court's finding of fact. While the appellee is contending that this judgment of fact is erroneous, we are not convinced that it is. But we do not concur in the conclusion of law that the facts showed the Pipe Line Company to be warehouseman in respect of the oil assessed. So far as the carrier is concerned, it was delivered for immediate shipment and went into its system of transportation. It would seem to make no difference that the flowing stream of oil went around these tanks instead of passing through them. An analogy not wholly fanciful is suggested between this and currency held intact in a bank's vault while that taken in daily from depositors is paid out to others without molesting that in the vault until the money

coming in is exhausted by the daily demands. It cannot be said that money in the vault is not in circulation.

The cases involving the question of whether goods in possession of a carrier are held as a warehouseman or in the capacity of a carrier have heretofore related to the matter of liability for their loss, there being a difference in the degree of duty to be observed in their care. It is the general conclusion that goods delivered for immediate shipment are possessed as a carrier, even though they are detained in its depot or stock pens in the usual course of business, or for the carrier's convenience. 10 C. J. 231, 232, 243, 244; Louisville & N. R. Co. v. Edwards' Adm'x, 183 Ky. 555, 209 S. W. 519; Southern Ry. Co. v. Smith, 125 Ky. 656, 102 S. W. 232, 31 Ky. Law Rep. 243; Louisville & N. Railroad Co. v. Gay, 143 Ky. 56, 135 S. W. 400, 33 L. R. A. (N. S.) 303. This relation continues until the goods arrive at their destination and the consignee is notified and given a reasonable time to receive them. Nor does the fact of temporary delay in route change the complexion. 61 C. J. 241; Champlain Realty Co. v. Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195; Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. Ed. 626; Louisville & N. Railroad v. Stiles, Gaddie & Stiles, 133 Ky. 786, 119 S. W. 786, 134 Am. St. Rep. 491; Gus Datillo Fruit Co. v. L. & N. Railroad Co., 251 Ky. 566, 65 S. W. (2d) 683.

According to the proof, all the oil involved was delivered for immediate shipment and the company was delivering it as demanded. There was continuity of intake and outlet. It was not proved that any of the individual shippers was withholding shipping orders for an unreasonable length of time or otherwise than in the ordinary course or custom of the business. It was simply a case of more coming in than was going out by reason of congestion. We are constrained therefore to hold that the Pipe Line Company had this oil in its possession as a common carrier and not as a warehouseman; consequently, that it is not liable for taxes thereon.

Was the oil assessable against the owners in Estill county? No taxes had been paid there upon it.

While property in actual transportation in interstate commerce cannot be taxed by the state or any

of its subdivisions, when it is merely in preparation for or awaiting movement it is taxable. Diamond Match Co. v. Village of Ontonagon, 188 U. S. 83, 23 S. Ct. 266, 47 L. Ed. 349; Champlain Realty Co. v. Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195; State of Minnesota v. Blasius, 290 U. S. 1, 54 S. Ct. 34, 78 L. Ed. 131. More than half the oil received by the Cumberland Pipe Line Company was moved in interstate commerce and delivered to connecting carriers on the Ohio and Big Sandy rivers; but that handled for the defendant owners in this case was intrastate, and the interstate feature is not present.

All property not exempt by the Constitution and not moving in interstate commerce is subject to ad valorem taxation against the owners somewhere. To hold that it is immune merely because it is in the possession of a common carrier would permit unjustifiable evasion. But in making the assessment of the oil in the Estill county tanks—as it would be anywhere along the line—two perplexing problems are presented: (1) What is the character of title of each owner of oil in possession of a pipe line carrier? (2) Where is the taxable situs?

The peculiar nature of the property and the relation of the numerous owners as between themselves and with the carrier makes the question in respect to the character of ownership not an easy one. In the matter of grain and perhaps other fungible property stored in a public warehouse or an elevator where the identical commodity is swallowed up in the common mass, it is generally said that the relation of the parties is that of tenants in common, each owning the proportion in which he contributed thereto. 6 C. J. 408, 410; 67 C. J. 454, 457. But compare Ferguson v. Northern Bank of Kentucky, 77 Ky. (14 Bush) 555, 49 Am. Rep. 418, and Mercer National Bank v. Hawkins, 104 Ky. 171, 46 S. W. 717, 20 Ky. Law Rep. 534, holding that a warehouse receipt issued by one who was not a public warehouseman for a part of property held in bulk or mass does not operate to make the holder a tenant in common and no title passes until there is a separation. There appears to be no authority upon this subject of character of ownership of oil in possession of a pipe line company in respect to taxation. Perhaps the classification of tenants in common must

be regarded as correct. It was so regarded in Jennings-Heywood Oil Syndicate v. Houssiere-Latrielle Oil Co., 127 La. 971, 54 So. 318, 327, Ann. Cas. 1913E, 679, and Buckeye Pipe Line Co. v. Fee, 15 Ohio Cir. Ct. R. 637, and the same case on appeal, 62 Ohio St. 543, 57 N. E. 446, 78 Am. St. Rep. 743. See, also, Enterprise Oil & Gas Co. v. National Transit Co., 172 Pa. 421, 33 A. 687, 51 Am. St. Rep. 746. However, the question would appear to be academic, for under the conclusion we have reached, whatever be the character or extent of ownership, the oil of these five defendants· had no taxable situs in Estill county.

We look to the matter of situs for taxation under the conclusion that the oil involved was in possession of the carrier for transportation and not in storage. As such, it must be regarded as being in Estill county temporarily.

Until 1906, under the ancient doctrine of mobilia sequuntur personam all tangible personal property in this state was taxed at the domicile of the owner regardless of its physical location. Closely following the decision of Union Refrigerator Transit Co. v. Commonwealth of Kentucky, 199 U. S. 194, 26 S. Ct. 36, 50 L. Ed. 150, 4 Ann. Cas. 493, holding that a number of cars owned by a Kentucky corporation but in various other states and in Canada had no taxable situs in Kentucky (thereby reversing our decision in Commonwealth v. Union Refrigerator Transit Co., 118 Ky. 131, 80 S. W. 490, 81 S. W. 268, 26 Ky. Law Rep. 23, 397), the General Assembly of 1906 (Laws 1906, c. 22, art. 1, sec. 7) enacted section 4025, Ky. Stat., which is in part as follows:

> "Tangible personal property shall be listed and taxes paid thereon in the county, municipality and taxing district where the same has established a taxable situs based on the actual situation of the property."

From the beginning that act has been consistently construed to mean an "actual situation" that is not temporary, otherwise it would lead to absurd and inequitable consequences. If property on the assessing day.is but temporarily situated elsewhere than at the domicile of the owner, it is not taxable at that temporary situs. If it have no other permanent place, then

it is regarded as having a taxable situs at the domicile of the owner. If it is transient, so much the more. Of course, the facts of each case control. Hill, Sheriff, v. Caldwell, 134 Ky. 99, 119 S. W. 749; City of Paris v. Burley Tobacco Society, 154 Ky. 320, 157 S. W. 705; Semple v. Commonwealth, 191 Ky. 675, 205 S. W. 789. The argument is advanced by the appellee that this oil was always in the county of origin and was a part of the general mass of property there and never at the homes of the owners, which were elsewhere. To sustain it we are cited to several cases, such as City of Paris v. Burley Tobacco Society, supra; and John Ross & Co. v. Board of Supervisors of Daviess County, 186 Ky. 593, 217 S. W. 677; and Millett's Ex'r v. Commonwealth, 184 Ky. 198, 211 S. W. 562. The fact that the property was ultimately to be moved did not affect the matter of location for assessment, it is said. Appellee also relies upon Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715, and Diamond Match Co. v. Village of Ontonagon, 188 U. S. 82, 23 S. Ct. 266, 47 L. Ed. 349, where property gathered at a place for purpose of shipment was held to be taxable at that point. There are some other foreign authorities dealing with property which had come to rest during or at the end of transportation and others involving intangible property, which are not in point. All these authorities become inapplicable under the conception that the oil involved in this state was in process of transportation. Furthermore, this property is of a wholly different nature from that involved in any of those cases and is in a different position, for the volume in possession of the carrier was spread over many counties and other taxing districts—some more and some less in quantity—with the right of the several thousand joint owners to demand delivery at different places along the line. The proportional shares of many of these owners were comparatively a few barrels. To endeavor to isolate the property of each to each of the taxing districts in accordance with the methods of measurement adopted by the trial court would result in absurdity. Cf. Petroleum Exploration v. Superior Oil Corp., 232 Ky. 635, 638, 24 S. W. (2d) 259. It is inconceivable that such is the intention of the statute. The stubborn fact is that the oil purchased by these five defendants (except perhaps a part by the Standard Oil Company) was acquired along the line east of Estill county and was

never actually in or near that county. Cf. Buckeye Pipe Line Co. v. Fee, supra.

Property in transit, whether it is actually moving or has come to temporary rest within the limits of a taxing district, does not acquire a taxable situs there as a part of the local wealth. 61 C. J. 241, 529; Commonwealth v. Union Pacific Ry. Co., 214 Ky. 339, 283 S. W. 119, 49 A. L. R. 1091; Union Refrigerator Transit Co. v. Kentucky, supra; section 301, Law of Oil and Gas by Mills & Willingham. In Prairie Oil & Gas Co. v. Ehrhardt, 244 Ill. 634, 91 N. E. 680, 682, the owner of crude oil in certain of its own tanks and pipe lines located in Will county, Ill., sued to restrain taxation. The company's pipe line ran through several states, and it was found, for reasons stated in the opinion, that the tanks were an integral part of the system of transportation and necessary to insure a constant flow of oil. The court declared, upon authority cited, that property in transit and passing through a district is not liable to local taxation. It is true that there was involved the matter of interstate shipment, and it is stated in the opinion that the oil flowed through the tanks as well as through the pipes, conditions not shown on this branch of the case. But these distinctions do not seem to affect the principal point; that is, that oil in the tanks was not subject to local taxation. Said the court:

"To hold that this oil, either in the tanks or in the pipes, was subject to taxation in Will county, would authorize its taxation through other taxing districts through which it might pass, and, if required to pay taxes in every state or county through which the pipe lines extended, it would amount to such a burden that transportation in this way would probably have to be abandoned."

We are of the opinion, therefore, that the oil sought to be subjected was assessable only at the domiciles of the owners.

The Standard Oil Company and the Ashland Refining Company showed that during the entire period they had ample facilities in their home plants in Jefferson and Boyd counties to care for all the oil they had in the hands of the Pipe Line Company at any one time and that such quantity was sufficient only for a few

weeks' supply. Moreover, although the appellee vigorously contends upon deductions made from the figures and taxable lists that neither company had done so, it appears pretty satisfactorily that both had assessed and paid taxes at their domiciles upon their oil in possession of the Pipe Line Company. The commonwealth did not establish that the other three defendants did not assess their oil in their respective domiciles.

Wherefore the judgment is reversed.

Whole court sitting.