Gary GILLIS, Secretary of the Revenue Cabinet, Movant,

v.

William D. YOUNT, Scott Barbour and others similarly situated, Alison Moore, J.D. Miller, Elaine Stoltzfus and others similarly situated and the Kentucky Coal Association, Respondents.

The KENTUCKY COAL ASSOCIATION, INC., Movant,

v.

Alison MOORE, J.D. Miller, Elaine Stoltzfus and all others similarly situated, William D. Yount and Scott Barbour and all others similarly situated, Respondents.

Nos. 87–SC–286–DG, 87–SC–288–DG.

Supreme Court of Kentucky.

March 3, 1988.

Rehearing Denied May 19, 1988.

Ross T. Carter, Douglas M. Dowell, Frankfort, for Gary Gillis.

Frederick W. Whiteside, Lexington, for amicus curiae, League of Women Voters.

Bruce F. Clark, Gayle W. Herndon, Stites & Harbison, Frankfort, for Kentucky Chamber of Commerce.

Ira A. Burnim, Washington, D.C., Phillip Shepherd, Joe Childers, Lexington, J. Richard Cohen, Morris S. Dees, Montgomery, Ala., for Moore Appellees.

James R. Cox, Hirn Reed & Harper, Louisville, for Kentucky Coal Assn.

Wayne J. Carroll, Ewen, MacKenzie & Peden, P.S.C., Louisville, for amicus curiae, Kentucky Farm Bureau Federation.

Joseph J. Leary, Frankfort, for Yount and Barbour.

LEIBSON, Justice.

These cases challenge the constitutionality of KRS 132.020(5), which classifies unmined coal separately from other real property and then taxes it "at the rate of one-tenth of one cent ($.001) per one hundred dollars ($100) of assessed value." All other real property is taxed "for state purposes" under KRS 132.020(1) at "thirty-one and one-half cents (31½¢) upon each one hundred dollars ($100) of value."

The cases are consolidated. In the first case Yount and others similarly situated, a class of real property owners, claim that the statute is unconstitutional because the General Assembly has arbitrarily classified one type of real property separately from other real property. In the second case Moore and others similarly situated, a class of automobile owners, claim that the 1 mil ("$.001") rate is unconstitutional because it is an exemption and not a tax.

The Franklin Circuit Court, after trial on the merits, entered judgment (1) rejecting the claim that the separate classification for unmined coal was constitutionally impermissible, and (2) upholding the claim that the tax rate "bestows on unmined coal a *de facto* exemption from property taxa-

tion," and thus "is unconstitutional under Sections 3 and 174 of the Constitution."

On appeal the Court of Appeals ruled in favor of the claims of *both* plaintiffs, agreeing with the trial court that this one mil rate for unmined coal was in fact an unconstitutional exemption, and then further holding that the separate classification of unmined coal was arbitrary and therefore unconstitutional under Section 171 of our Constitution which requires that "[t]axes ... shall be uniform upon all property of the same class subject to taxation within the territorial limits of the authority levying the tax."[1]

A majority of our Court has decided that the classification issue is the threshold issue on discretionary review. Having decided that KRS 132.020(5) is an arbitrary classification in violation of Section 171 of the Kentucky Constitution, as quoted above, the Court has elected not to consider whether the $.001 ad valorem levy upon unmined coal is an unconstitutional tax rate.

Both sides agree that Kentucky law classifies ownership of unmined coal as an interest in real estate. As stated in *Williams' Adm'r v. Union Bank and Trust Co.*, 283 Ky. 644, 143 S.W.2d 297, 300 (1940): "[i]t has long been the law of this State that minerals in place are real estate...." And as stated in *Commonwealth v. Elkhorn–Piney Coal Min. Co.*, 241 Ky. 245, 43 S.W.2d 684, 686 (1931):

"[T]he rights created by a coal lease ... constitute real estate for the purposes of taxation under our present statutes."

From 1792, when Kentucky's first property tax was levied, until the 1970's, coal was taxed only insofar as it was included in the value of the surface property. Then in the 1970's, the General Assembly enacted a new type of tax, the severance tax, first applicable only to coal and then extended to "the physical removal of [any] natural resource from the earth or waters of this State by any means" with certain exemp-

tions and exceptions which are not relevant to this case. KRS Chapters 143 and 143A.

The new tax is an excise tax "upon the privilege of severing and processing coal" and not a property tax. *Circle "C" Coal Co., Inc. v. Com.*, Ky.App., 628 S.W.2d 883, 885 (1982). Coal was the first mineral, and is perhaps the major one, subject to this new excise tax, the severance tax, but it is certainly not the only one. "Rock, stone, limestone, shale, gravel, sand, clay, natural gas, and natural gas liquids," are all classified as a "natural resource" (KRS 143A.010) and taxed at the same rate (KRS 143A.020), which is 4½%. Under KRS 137.-120 a similar tax is imposed upon "all crude petroleum produced in this state."

However, for purposes of ad valorem taxation unmined coal alone has been separately classified from other real estate. In 1976, the General Assembly classified coal separately from other real estate for the first time (1976 Kentucky Acts, Chapter 84, Section 7), and in 1978 the General Assembly followed this up with the new rate of one cent per thousand (one mil) enacted in KRS 132.020(5). The connection between classifying unmined coal separately from other interests in real property subject to ad valorem tax and then imposing the new one mil rate for such property is abundantly clear from review of the legislative history of the one mil rate.

The framers of the 1891 Kentucky Constitution, to protect the people, enacted significant constitutional limitations upon the powers of the General Assembly to impose state property taxes and create exemptions. 2 Debates Constitutional Convention 1890, 2372–2423 (1890). The primary source of tax revenue at the time was property taxes, and this is where the problems with unfairness were perceived, so these constitutional limitations, covered principally in Kentucky Constitutions Sections 170–175, deal *only* with the power to tax property, or ad valorem taxes. They require *inter alia*, that taxes "shall be uniform upon all property of the same

---

1. The Court of Appeals held that another issue presented, the propriety of awarding attorneys' fees, was not preserved for appellate review because the appellants did not designate the attorneys as parties to the appeal. We have not considered this issue on discretionary review.

class," (Section 171), that "all property, not exempted from taxation by this Constitution, shall be assessed ... at its fair cash value" (Section 172), and that "all property ... shall be taxed in proportion to its value, unless exempted by this Constitution; and ... shall pay the same rate of taxation" (Section 174). The constitutional exemptions are specified in Section 170, which states that "all laws exempting or omitting property from taxation other than the property above mentioned shall be void." It is almost impossible to see how the constitutional mandate on state property taxes could have been expressed in clearer or more positive terms.

The one mil rate (one cent per thousand) was devised as a method to avoid these constitutional restrictions. *See* Joint Submission, Kentucky Department of Revenue, *Annual Report* HS–88 (1975–76). The movant, Gary Gillis, Secretary of the Revenue Cabinet, candidly conceded that the legislative purpose behind a one mil rate is to create a *de facto* exemption, although arguing that this is constitutionally permissible. The only way to effect such a purpose, a *de facto* exemption, with reference to unmined coal was to first classify it separately from other real property, and to then designate one mil as the applicable rate. The statutes of 1976 and 1978 were enacted as a plan to effect this purpose.

The need to enact a one mil rate when the General Assembly wished to favor a certain type of property with a *de facto* tax exemption resulted from the decision of our Court in *Russman v. Luckett,* Ky., 391 S.W.2d 694 (1965). *Russman* is the bellwether case on the subject of constitutional limitations on property taxes. It was a taxpayers' suit attacking the assessment procedures then in place by which "real estate and tangible personal property in Kentucky [were] assessed for tax purposes at varying percentages substantially less than 100 percent of fair cash value." 391 S.W.2d at 695. Our Constitution, Section 172, specifies that "[a]ll property, not exempted from taxation by this Constitution, shall be assessed for taxation at its fair cash value." Nevertheless, over a period of 75 years the practice had evolved of

"substituting the test of 'uniformity' in place of 'fair cash value'." In *Russman,* our Court delivered to the executive branch and the legislature the message that in the area of property taxes, when called upon to do so, our Court was prepared to enforce the Constitutional mandate. We stated that there is "no authority which would recognize an implied repeal of a constitutional provision because of its continued violation by public officials. The suggestion is appalling." *Id.* at 697.

As admitted by the Revenue Cabinet, primarily in reaction to *Russman* the concept of a one mil tax rate developed to avoid the tax burden for certain types of property which did not enjoy constitutional exemption but which were perceived by the General Assembly as needing *de facto* exemption in the public interest. Because unmined coal was taxed as an interest in real estate, in order to favor unmined coal with this *de facto* exemption it was necessary to employ a two-stage procedure, first classifying it separately from other real estate, and then assigning to it the 1 mil rate. The question is, of course, whether this procedure is legitimate tax avoidance or unconstitutional tax evasion; does the method instituted to avoid the constitutional limitations in Section 172 impale upon the constitutional limitations in Sections 171 and 174? In answering that question there are several arguments in the present case that track similar arguments in *Russman,* and that are fully answered by the *Russman* opinion.

Movants argue that the 1891 Constitution is "outmoded," that the stated purpose for and definition of taxation as stated in Section 171, raising revenue "to defray the estimated expenses of the Commonwealth," fails to take account of the present need to use taxation to promote economic development, and therefore the judiciary should aid and abet the General Assembly in structuring taxation free from constitutional restraints. The Revenue Cabinet's Brief claims:

"The politics and issues of Kentucky in 1890 are as foreign to this generation as the intrigues of ancient Rome. The reve-

nue provisions of the Constitution shackled the hand of the legislature to keep it from embracing the corrupt and polluting grasp of wealthy corporations. Today there is no need to tighten those shackles to prevent the legislature from extending a benevolent hand to ... others [presumably the owners of unmined coal] who honor their debt to the Commonwealth in ways worthy of legislative consideration."

The record is not convincing that circumstances today are so different that constitutional restrictions on the power of the General Assembly with regard to property taxes are no longer viable. With special interests and pressure groups seemingly better organized, better financed and more powerful than ever before, we can hardly take judicial notice that the General Assembly should be free from constitutional restraint to manipulate the tax structure to extend "a benevolent hand" to those "who honor their debt to the Commonwealth in ways worthy of legislative consideration." The proponents of the special tax treatment for unmined coal in KRS 132.020(5) have yet to provide any hard information in the record or in briefs as to how this statute benefits anyone but the coal owners. The best that has been offered is an argument that it is part of an overall scheme for taxing the coal industry in which the severance tax paid by coal producers "more than makes up" for any potential loss of revenue.

Even if we were inclined to accept as fact that the people of Kentucky no longer need protection from the "corrupt and polluting grasp of wealthy corporations" (or the power of today's special interest groups), we are not free to strike the constitutional mandate. We have no power to ignore the plain meaning of the Constitution when we believe it expedient to do so. As stated in *Russman:*

"... we are dealing with our fundamental law. It is not outdated, or obsolete, or contrary to any policy we know of.... This law today is just as vital and enforceable as it was the day it was written into the Constitution." 391 S.W.2d at 697.

Where constitutional change is needed, the process is not by legislative enactment and judicial acquiescence, but by constitutional amendment. In *Fannin v. Williams,* Ky., 655 S.W.2d 480 (1983), we were faced with powerful arguments that the constitution should be circumvented in the public interest. Nevertheless, we recognized that it was our judicial duty to declare unconstitutional a statute supplying textbooks to children in the state's non-public schools.

"The people of Kentucky specified by the language of the Constitution ... that the type of expenditure authorized by the statute in question should be unconstitutional. If the people of Kentucky wish to change their position in this matter, it is their right to do so.

... If the legislature thinks the people of Kentucky want this change, they should place the matter on the ballot.

... We cannot sell the people of Kentucky a mule and call it a horse, even if we believe the public needs a mule." *Id.* at 484.

The movants argue that judicial intervention in matters of taxation usurps the legislative function. The judiciary intervenes only when called upon by the litigants to settle a case in controversy. But when so called upon it is part of the exercise of this function to enforce constitutional restrictions on legislative power. The judiciary cannot abdicate its responsibility by deferring to the legislature. As stated by Mr. Justice Roberts in *United States v. Butler,* 297 U.S. 1, 62–63, 56 S.Ct. 312, 317–18, 80 L.Ed. 477 (1936), in reviewing the judiciary's "responsibility to render judgment in accordance with the principles established for the governance of all three branches of the Government":

"It is sometimes said that the court assumes a power to overrule or control the action of the people's representatives. This is a misconception. The Constitution is the supreme law of the land ordained and established by the people. All legislation must conform to the principles it lays down. When an act of Congress [or in our present case the Gen-

eral Assembly] is appropriately challenged in the courts as not conforming to the constitutional mandate the judicial branch of the Government has only one duty,—to lay the article of the Constitution which is invoked beside the statute which is challenged and to decide whether the latter squares with the former."

The opinion continues:

"This court neither approves nor condemns any legislative policy. Its delicate and difficult office is to ascertain and declare whether the legislation is in accordance with, or in contravention of, the provisions of the Constitution; and, having done that, its duty ends."

In *Russman,* in language expressing the same concept, our Court stated:

"In the performance of our duty we are not, by this decision, in any sense changing the law of taxation, or the tax structure, or increasing the tax burden. We are simply declaring and enforcing the law [i.e., the Constitution], and the law is made by the people." 391 S.W.2d at 700.

The original 1891 proviso in Section 171 of the Kentucky Constitution specified that all state property taxes shall be "uniform upon all classes of property." In 1915 by Constitutional Amendment this was changed to specify "uniform upon all property of the same class." We took up the effect of this Amendment in *Martin v. High Splint Coal Co.,* 268 Ky. 11, 103 S.W.2d 711, 712–13 (1937). The legislation at issue in *Martin* attempted to exempt *all* real property from taxation, and then to separately classify "minerals" so as to permit continued taxation of mineral estates, and coal in particular. The situation was the reverse of the present case but the principles at issue were essentially the same. We held the statutory scheme unconstitutional. We stated:

"[T]he question is *not* whether it is competent for a Legislature to either classify or exempt property from taxation *where* there are *no* constitutional provisions prohibiting either classification or exemption." *Id.* 103 S.W.2d at 712–13. [Emphasis original.]

In *Martin,* we explained the effect of the 1915 Amendment to Section 171. The 1915 Amendment to Section 171 did not alter the fundamental constitutional injunction that all property must be taxed. *Martin v. High Splint Coal Co., supra; Cumberland Pipeline Co. v. Commonwealth,* 258 Ky. 90, 79 S.W.2d 366 (1935). Nor did it authorize the General Assembly to separately classify except by distinctions related to the particular characteristics of the property relevant to the purposes of taxation, and not artificial distinctions to accommodate the economic situations of a particular industry, unrelated to taxation.

According to its legislative history, the 1915 Amendment did not generate from a perceived need to *favor* certain classes of property in the process of taxation. On the contrary, the perceived need was to *remedy* "an unfair proportion of the burden of government [being] borne by visible property [real property and other tangibles], which cannot escape taxation, and wholesale evasion by such forms of property as are easily hidden [intangibles]." Report of the Special Tax Commission, 1909, pp. 3–4. The Report states:

"The answer is found in the experience of other States which have proved that under a reasonable tax rate [for intangibles] many millions of dollars of property, previously withheld from assessment, have been listed for taxation. For the most part, men seem to prefer to deal squarely in the matter of listing their property if they can do so without suffering what they consider unnecessary confiscation." *Id.,* p. 26.

It is difficult to understand the logical underpinnings of the movants' argument that this special tax classification for unmined coal, and this special tax treatment favoring those who own unmined coal (the one mil rate), benefits economic development. The record shows that vast amounts of Kentucky's unmined coal reserves are owned by different interests than those who mine it, process it and distribute it. Those persons and corporations engaged in the production and sale of coal, generating jobs and dollars, would seemingly have a much stronger claim on the General As-

sembly for protective legislation than those harboring it in its natural state. The economic development arguments presented by the Revenue Cabinet and the Kentucky Coal Association, Inc. are tenuous and speculative. As we stated in the case of *Tabler v. Wallace*, Ky., 704 S.W.2d 179, 187 (1986):

> "The only apparent basis for the present legislation is that a special class ... lobbied for a statute.... There is no social or economic basis presented to justify a special class, only their own self-interest. Other groups similarly situated do not share in their legislative windfall. Their subjective reasons will not withstand public policy analysis." *Id.* at 187.

We conclude here, as we did in *Tabler*, that "imaginative reasons that *could* exist, without anything of a positive nature to suggest that they *did* exist, do not suffice." *Id.*

Nevertheless, if we were to assume that such arguments are valid for reasons that cannot be satisfactorily explained, the critical point in this case remains that the constitutionality of the one mil tax on unmined coal does not turn on whether the General Assembly perceived that this favorable tax treatment served a public purpose, but on whether the tax classification is constitutionally permissible within the limiting language of Section 171. Thus, as stated in *United States v. Butler*, quoted *supra*, our "duty" is "to lay the article of the Constitution which is evoked beside the statute which is challenged and decide whether the latter squares with the former." 297 U.S. at 63, 56 S.Ct. at 318.

Under Section 171 the stated purpose for taxation is to raise revenue which, "with other resources, shall be sufficient to defray the estimated expenses of the Commonwealth for each fiscal year." As we stated in *Atlantic Coastline R. Co. v. Commonwealth*, 302 Ky. 36, 193 S.W.2d 749, 752 (1946):

> "It is always to be borne in mind that the taxing statutes are framed to produce revenue."

And in *Gray v. Methodist Episcopal Church*, 272 Ky. 646, 114 S.W.2d 1141, 1143 (1938), a levy classifies as a tax if "for purposes of raising revenue." The 1915 Amendment does not change any of the other clauses of the Constitution restricting state property taxes; it simply permits the General Assembly to tax different classes of property separately. All property must still be taxed, and this must be a *bona fide* tax, i.e., one which has for its purpose raising revenue rather than exempting property from taxation.

From the historical material that has been presented to us (e.g., statements of some individuals contained in the Report of the Special Tax Commission, 1915, Chapter 4) it appears that many advocated for broader constitutional amendment, eliminating all constitutional restrictions on state property taxes. But it is clear from the limited nature of the amendment that was finally proposed and adopted, and the subsequent rejection of more expansive amendments, such as the proposed 1932 Amendment "to provide by law that real estate and/or tangible personal property may be exempted from taxation for state purposes (*See* 1932 Acts Ch. 141 rejected by an overwhelming majority)," that our people have never yet favored permitting any further inroads into the constitutional limitations on state property taxes. The cases and materials available to us refute this contention. Cases advocated by the movants in urging us to a different course, such as *Delta Airlines, Inc. v. Commonwealth, Revenue Cabinet*, Ky., 689 S.W.2d 14 (1985), are inapposite because the taxes involved are *not* state property taxes, and thus not subject to the constitutional restrictions on state property taxes.

Quite obviously the 1891 version of the constitutional mandate in Section 171, that all classes of property shall be taxed the same, was changed by the 1915 Amendment. The question is, of course, what is the nature and effect of the change wrought by the 1915 Amendment. That the intended effect was limited is evident from the fact that only *one* change was made in state property taxes.

We are aware that a *further* change was made giving the General Assembly more power over "local taxation," to wit:

"The General Assembly shall have power to divide property into classes *and to determine what class or classes of property shall be subject to local taxation.*" [Emphasis added].

But this grant of additional power in *local* taxation simply reenforces the conscious decision to make only *one* change in the restrictions on *state* property taxes, that change being to permit property of one "class" to be taxed at a different rate than property of another.

So the question is what was accomplished by this one change in the constitutional structure limiting state property taxes? What does the Constitution mean by "classes" for purposes of ad valorem taxes? The answer rests in the general principle that constitutional provisions permitting classification *always* carry with them the limitation that the classification scheme must be *reasonable,* not *arbitrary,* and this in turn requires classification on the basis of "an appreciable relevancy to the subject matter of the legislation." *Bd. of Educ. of Jefferson Co. v. Bd. of Educ.,* Ky., 472 S.W.2d 496, 498 (1971).

The subject matter in *Bd. of Educ. of Jefferson Co. v. Bd. of Educ. of Louisville* was the constitutional limits on classification effected by Sections 59 and 60 which forbid special and local legislation. But viewed as a problem in constitutional interpretation, the issue is essentially the same as the classification problem presented by Section 171. We stated the rule thusly:

"[T]he General Assembly may indulge in class legislation if the classification is made to depend upon natural, real or substantial distinctions, inhering in the subject matter, such as suggest the necessity for or propriety of independent legislation in regard to the class specified. A classification based upon purely artificial, arbitrary or fictitious conditions is unreasonable and will not be permitted." 472 S.W.2d at 498.

The present problem does not turn on whether real property is a super class which cannot be subdivided for purposes of taxation, although that argument has been presented. We need only decide whether a separate tax classification for unmined coal treating it differently from all other interests in real estate, including other interests with similar characteristics such as oil and gas in its natural state, is a classification that is, or is not, related to the constitutionally permissible classification for tax purposes. If it is "[a] classification based upon purely artificial, arbitrary or fictitious conditions [it] is unreasonable and will not be permitted." *Bd. of Educ. of Jefferson Co.,* as quoted *supra.* For instance, the General Assembly could not classify state real property for taxation according to size or location rather than value because this would be arbitrary classification. Differences of a nature which permit classification for one governmental function are not transferable to permit classification for a different function. In this case the function is taxation. The classification serves no legitimate purpose to promote the governmental function directly involved.

The kind of differences that justify separate classification for purposes of state property taxation are the kind of difference that was the motivation behind the constitutional amendment, justifying separate classification of real estate and intangible property taxes. *See* Report of the Special Tax Commission, 1909, *supra. See also, Kentucky Finance Co. v. McCord,* Ky., 290 S.W.2d 481 (1956), recognizing that the Constitutional Amendment permits the General Assembly to classify intangible personalty separately from real estate and assign a different tax rate.

There is no difference between unmined coal and other unmined minerals for purposes of taxation unless it be in movants' claim that the economic importance of the coal industry to our state, standing alone, is sufficient to justify separate classification. But this argument is fatally flawed for two reasons:

1) Assuming that coal has a special economic importance qualitatively different from any other interest in real estate, this special classification and rate for unmined

coal does not promote the coal industry but only one element in the industry, the coal owners. Indeed, the moral justification advanced for excusing coal owners from taxation is that the coal producers will make up the difference for the coal industry through the severance tax. But coal owners and coal producers are often two different taxpayers, so this reasoning does not withstand scrutiny. However, even if it did the severance tax (as an excise tax) would be unrelated to constitutional restrictions on state property taxes.

2) If the difference between unmined coal and other unmined minerals is the difference in the economic importance that the coal industry assigns to itself by reason of its size, size alone does not constitute a reason for classification unless that size produces other qualitative differences related to the purpose of the classification. *Bd. of Educ. of Jefferson Co. v. Bd. of Educ. of Louisville,* quoted *supra.*

On this point movants rely on language of the court in *Delta Airlines Inc. v. Comm. Revenue Cabinet, supra.* The *Delta Airlines* case involved an assessment for sales and use taxes against airlines of fuel and food purchases in Kentucky. The airlines claimed that the tax was discriminatory because other transportation industries, notably trucks and other motor common carriers, received different and more favorable tax treatment from the General Assembly on their fuel purchases in Kentucky. We stated:

"This Court has determined that economic factors are valid considerations which the legislature may take into account in developing a legitimate tax classification. . . .

The different tax treatment for airlines, truck lines, barge lines, bus lines and railroad lines can be justified by their different competitive environment and their different significance to the overall state economy. . . ." 689 S.W.2d at 18.

But these are *excise* taxes not subject to the constitutional restrictions on state property taxes in Section 171. Making tax distinctions for purposes of promoting some perceived state economic advantage rather than for purposes related to raising revenue is permissible in taxes other than property taxes because other kinds of taxes do not involve the same constitutional restrictions. Excise taxes may be varied from one type of taxpayer to another to promote competitive conditions or some perceived state economic advantage; classification may be structured to serve some purpose other than taxation. But the tax scheme for state property taxes expressed in the 1891 Constitution and unchanged by the 1915 Amendment, was exactly the opposite, i.e., taxation is permitted for the limited purpose of raising revenue and shall not be subject to manipulation to promote any taxpayer's (or group of taxpayers') economic advantage regardless of whether the General Assembly should perceive that some other public benefit may be derived by doing so.

A case similar in principle is *City of Corbin v. Louisville & N.R. Co.,* 233 Ky. 709, 26 S.W.2d 539 (1930). In that case the governmental entity, the City of Corbin, agreed to a contract with the railroad, and enacted an ordinance, providing reimbursement of a tax assessment in exchange for permission to utilize a portion of the railroad's property in constructing a sewer system. We held the ordinance and contract unconstitutional, stating "the railroad secured ... a right or privilege denied to other property owners similarly situated. . . . The ordinance was for the benefit of one taxpayer." *Id.* 26 S.W.2d at 540. Here the statute is for the benefit of one group of taxpayers, those owning an interest in unmined coal, who cannot be distinguished from other taxpayers for any reason related to the purpose for property taxes stated in Section 171 of the Constitution, which is raising revenue "to defray the estimated expenses of the Commonwealth."

The judgment of the trial court holding the statute in question, KRS 132.020(5), is unconstitutional, and the decision of the Court of Appeals affirming this holding, are affirmed.

STEPHENS, C.J., and LAMBERT, VANCE and WINTERSHEIMER, JJ., concur.

LEIBSON, J., concurs in this opinion, and also files a separate concurring opinion.

WINTERSHEIMER, J., concurs by separate opinion in which LEIBSON, J., joins.

STEPHENSON, J., dissents by separate opinion in which GANT, J., joins.

WINTERSHEIMER, Justice, concurring.

I concur with the result achieved by the majority but wish to express my reasons separately.

This case specifically involves the constitutionality of KRS 132.020(5) which classifies unmined coal differently from other real property and provides a tax rate of $.001 per hundred of assessed valuation.

Unmined coal in place in the ground is real property distinct and separate from the surface estate. *Williams' Admr. v. Union Bank & Trust Co.*, 283 Ky. 644, 143 S.W.2d 297 (1940). Unmined coal is subject to taxation as real property. Severance of the coal from the surface has recently been affirmed by a majority of this Court in *Akers v. Baldwin, et al.*, Ky. 736 S.W.2d 294 (1987). Section 3 of the Kentucky Constitution does not permit exemptions from taxation. Section 171 of the constitution provides that annual taxes along with other resources shall be sufficient to support the expense of government and shall be uniform. Section 172 provides that all property shall be assessed at its fair cash value, and Section 174 provides that all property shall be taxed in proportion to its value. Clearly the Constitution requires uniformity and equality in taxation.

The proper way to distribute the burdens of government justly is to allow taxation to rest equally on all. *See* 2 Debates, Constitutional Convention 2372–2423 (1890); *Kentucky Finance Co. v. McCord*, Ky. 290 S.W.2d 481 (1956).

KRS 132.020(5) effectively exempts unmined coal from property taxation. The evidence in the circuit court indicates that it produces almost no revenue with only $2,067 being recorded in 1983 on assets estimated at between $6 and $12 billion. The rate, $.001, makes it uneconomical for local PVAs and the Revenue Cabinet to assess or collect the tax because the cost of administering it far exceeds any possible yield.

Section 171 as originally adopted in 1891 did not authorize the legislature to create different classifications of property for ad valorem tax purposes. In 1915 Section 171 was amended by the addition of the words "of the same class" to the sentence which required uniform taxation. The legislature was specifically authorized to classify property for both state and local taxation. Uniformity of rate of property in the same class was still required and there was no permission to exempt any property from taxation. *Martin v. Highsplint Coal Co.*, 268 Ky. 11, 103 S.W.2d 711 (1937).

In 1976 the legislature amended KRS 132.020 by adding § (5) which imposed a separate tax on unmined coal. In 1978, the legislature reduced the tax rate for the newly created classification of unmined coal from 31½¢ per hundred to .001 per hundred. The sole issue is whether the separate classification by the legislature of "unmined coal" for the purposes of taxation is invalid. Constitutional limitations prohibit only such classification which is not arbitrary and unreasonable and has no fair and substantial relation to the permissible governmental purpose of the legislation. *See Department of Revenue v. Spalding Laundry & Dry Cleaning Co.*, Ky. 436 S.W.2d 522 (1968). The classification for taxation is a policy matter for legislative determination. Ordinarily the judgment of the legislature is to be deferred to if there is any just and reasonable basis to support such a decision. The question then becomes whether it was arbitrary and unreasonable for the legislature to create a separate classification for unmined coal and to tax it at a much lower rate than that applicable to other real property. The existence of vast unmined and untaxed coal

reserves does not promote the coal industry and does not provide jobs in support of the economy of the state. It is difficult to see how the creation of a separate classification and the unusually low rate of taxation serves any governmental or public purpose. Consequently the separate classification for unmined coal is arbitrary and unreasonable and has no fair substantial relation to a permissible governmental purpose.

The words used in the constitution should be given their ordinary meaning. The plain meaning of the word "tax" is a charge upon property for the purpose of raising revenue to defray the cost of government. The debates which the framers of the Kentucky Constitution of 1890 recorded clearly show that the burden of taxation should be spread widely in order to distribute the cost of government among all forms of property and that all property not specifically exempted should bear a real part of the public responsibility for financing governmental services. 2 Debates, *Constitutional Convention*, 2372–2423 (1890). The levy imposed by KRS 132.020(5) is not truly a tax within the meaning of Section 174 of the constitution. The legislature is prohibited by Section 3 from exempting any class of property from taxation and the legislature may not do indirectly what the Constitution forbids it to do directly. *Commonwealth v. O'Harrah*, Ky., 262 S.W.2d 385 (1953).

The tax rate enacted in KRS 132.020(5) has effectively allowed the owners of unmined coal to be free of contributing to the cost of government. It results in a *de facto* exemption from property tax. The freedom to classify property does not permit the legislature to exempt property. Therefore the statute, KRS 132.020(5) is unconstitutional.

The determination that this statute is unconstitutional does not in any way affect other sections of KRS 132.020. It is not the place of this Court to determine the adequacy of a tax rate unless such a rate is so clearly and manifestly insufficient that it becomes in fact an exemption which is prohibited by the Constitution or that it is so high as to become confiscatory and unfair.

LEIBSON, J., concurs with this concurring opinion.

LEIBSON, Justice, concurring.

The majority opinion should go further and address the second major issue in the case, the constitutionality of setting a one mil tax rate for unmined coal, as established in KRS 132.020(5), under Sections 3, 170 and 174 of our Kentucky Constitution.

We should address this problem for two reasons, one theoretical and one practical:

The theoretical reason is that classification and rate are not two different problems, but interrelated elements of a single problem. Sections 170, 171 and 174 of the Constitution are parts of a single plan to constitutionally control state property taxes, constitutionalized in Sections 170–175. The meaning of the words in any one part of the constitution plan can only be grasped by considering the entire plan, not by considering isolated phrases. To analyze the constitutional challenge, we must test it against the constitutional plan, rather than any single element in the plan.

The practical reason is that the same coal interests who promoted the separate tax classification and rate for unmined coal in the first place will now move with all deliberate speed to promote legislation intended to circumvent our decision, perceiving (I believe erroneously) that by failing to address the rate issue we implicitly recognize that a one mil rate would be valid if the class were expanded. In short, to paraphrase from *Lexington Herald–Leader Co., Inc. v. Meigs*, Ky., 660 S.W.2d 658, 661 (1983), I "conclude that the controversy before us is not moot" and is "capable of repetition."

Separate classification of property for taxation, per se, is innocuous. It has no constitutional significance until the property separately classified is assigned a different rate. The 1976 statute setting up unmined coal in a separate classification would have been meaningless as long as this type of real property carried the same

tax rate as other real property. It was the next step in the plan, the 1978 enactment assigning the one mil rate, that converted the statute at issue, KRS 132.020(5), into a constitutional problem.

Sections 174, 170 and 3 of our Constitution provide in pertinent part:

1) In Section 174: "All property, whether owned by natural persons or corporations, shall be taxed in proportion to its value, unless exempted by this Constitution; and all corporate property shall pay the same rate of taxation paid by individual property."

2) In Section 170, after specifying constitutional exemptions: "and all laws exempting or omitting property from taxation other than the property above mentioned shall be void."

3) And in Section 3 (part of the Bill of Rights), for good measure: "no property shall be exempt from taxation except as provided in this Constitution...."

The one mil tax rate on unmined coal is unconstitutional because it effects a *de facto* exemption rather than a revenue raising measure, and as such it violates these provisions established for our constitutional protection. It violates the constitutional command that "all property ... shall be taxed in proportion to its value, unless [constitutionally] exempted." And therefore its constitutional shortcomings will not be overcome by expanding the separate statutory classification for unmined coal to add other (or all) unmined minerals. It would still be an exemption and not a rate.

Whereas there are other types of property, such as stocks and bonds and similar intangibles, whose value is so easily determined and assessed that a low tax rate does not make the tax unworkable and thus effect an exemption, and whereas there may well be reasons related to raising revenue that may justify a very low tax rate for such other classes of property, the effect of a one mil rate for taxing unmined minerals in general, and coal in particular, necessarily creates an exemption because of the nature of the property. This was the legal conclusion reached by the trial court in holding the tax rate was unconstitutional because it amounted to an exemption and not a tax, and findings of fact by the trial court leading to this conclusion stand unchallenged on this appeal. These include, in pertinent part:

1) The legislative history behind the one mil tax rate proves that it was deliberately developed as a "way ... to effectively exempt a class of property without amending ... the constitution."

2) "KRS 132.020(5) effectively exempts unmined coal from property taxation in basically two ways. First it produces a 'nil amount' of revenue. For example, in 1983, the last year for which there is evidence in the record, the total yield from the levy on unmined coal was at best, $2,067. This yield was on assets that in 1983 were worth approximately six through twelve billion. Second, the .001 rate makes it uneconomical and irrational for the Revenue Cabinet and the Commonwealth's Property Valuation administrators ... to assess or collect a levy because, as the evidence reflects, the cost of administering the levy far exceeds its possible yield."

3) As a result "the Kentucky Revenue Cabinet does not enforce the mandate of KRS 132.020(5) that a property tax on unmined coal be administered, and in fact sanctions the failure of many P.V.A.'s to assess 'unmined coal' for taxation.... [I]n 1978, prior to the $.001 rate going into effect, some 50 counties had assessments of unmined coal on their tax books; however, by 1983, this number had fallen to 23."

The trial court concluded that the "minuscule levy imposed by KRS 132.020(5) is not a 'tax' in the sense intended by the framers"; that the "plain meaning of the word 'tax', as used by the framers ... is: a charge upon property the purpose of which is to raise revenue to defray the costs of governmental operations."

The trial court reviewed the record of the 1890 Constitutional Convention on this subject (2 *Debates Constitutional Convention 1890*, 2372–2423 (1890)), and concluded: "When the framers required that 'all property ... be taxed', Ky. Const. Section 174,

they intended that all property not specifically exempted from taxation bear a meaningful tax burden." The trial court further concluded that a levy must be "intended to increase the net financial resources of the Commonwealth" to be a tax, and that it is not a tax if it "would not under any reasonably foreseeable set of circumstances increase the financial resources of the Commonwealth." *None* of these findings or conclusions are refuted by the record.

The trial court correctly applied the principle of constitutional law stated in *Commonwealth v. O'Harrah,* Ky., 262 S.W.2d 385 (1953), that "[t]he General Assembly may not do indirectly what the Constitution forbids it to do directly."

The Secretary of the Revenue Cabinet expressly *agreed* with a statement from the 1983 Legislative Research Commission report stating that the 1978 Act reducing the rate to one mil *"for all intents and purposes exempted unmined coal from the state property tax."* [Emphasis added.] He *conceded* that this rate is "used by the General Assembly to provide tax exemptions through statutory procedures rather than constitutional amendments." The thrust of the movants' argument is that "a *de facto* exemption in taxation" is not unconstitutional because "the general constitutional principle that the legislature cannot do indirectly whatever it is forbidden to do directly" does *not* "appl[y] to the field of taxation."

On the contrary, there is no constitutional difference between a tax case and any other. We are not free to ignore the plain meaning of the words providing a constitutional limitation on taxation, any more than we are at liberty to do so elsewhere in the Constitution. As stated in 71 Am.Jur.2d, *State and Local Taxation,* § 310 (1973):

"When the state constitution limits the power of the legislature to grant tax exemptions, it will not be permitted indirectly to grant an exemption which it is precluded from granting directly."

A *de facto* exemption is no more constitutional than a *de jure* exemption.

The movants' position is best described simply as frustration with the failure of the people of Kentucky to amend their constitution to permit the General Assembly to exempt property when persuaded that to do so will advance some perceived state economic interests. In sum, the movants concede that the one mil tax rate on unmined coal is a *de facto* exemption, but argue that: (1) "[o]n its face, KRS 132.-020(5) does not contravene Section 174 of the Kentucky Constitution"; (2) the reason behind the 1891 constitutional restrictions forbidding property tax exemptions "no longer exists"; and (3) therefore the General Assembly should be permitted to manipulate the state property tax in its unfettered discretion to "promote competitive conditions and to equalize economic advantage as with other taxes not subject to the same constitutional restrictions."

The nature of the movants' legal argument can be understood from a sentence in the Conclusion to the Brief filed by the Revenue Cabinet:

"If the General Assembly decides to tax certain property at one mil per one hundred dollars of value, then those who don't like that policy must turn to the ballot box, not to the courts."

However, when the issue is the Constitution the law is exactly the opposite. It is written in the Constitution that no property shall be legislatively exempted from taxation and the people have the right of redress to the court to enforce this principle. It is those who wish to change this constitutional principle, and not those who can persuade the General Assembly to enact an exemption, who must "turn to the ballot box, not to the courts," by seeking a constitutional amendment. The power of the people to challenge the constitutionality of tax legislation in the courts is established by *Russman v. Luckett,* Ky., 391 S.W.2d 694 (1965). Short of constitutional amendment, the people are not restricted to registering their complaint at the ballot box or to engaging in a tug of war with special interest groups in the halls of the legislature. The constitution is the first line of protection for our people, not the last line of retreat.

In *Commonwealth v. O'Harrah, supra,* when faced with a statute that violated the terms of the constitution although arguably of great public benefit, we said:

"Constitutional provisions, whether operating by way of grant or limitation, are to be enforced according to their letter and spirit, and cannot be evaded by any legislation which, though not in terms trespassing on the letter, yet in substance and effect destroy the grant or limitation." 262 S.W.2d at 389.

We stated the rule is that "[t]he courts may not countenance an evasion or even an unintentional avoidance of our fundamental law." *Id.* This rule applies even if the General Assembly is persuaded that the legislation serves the state's economic interests, and even though the legislation would appear to have popular support. Constitutional validity is not decided by a popularity contest.

The central fact in this case is that the format for state property taxes, including restrictions and limitations, is constitutionalized. The words of the Constitution are clear in their meaning: all property must share in the tax burden ("shall be taxed in proportion to its value") and there shall be no exemptions except those expressly enumerated in the Constitution. The record of the Convention bears this out:

"[T]he more we investigated it the more clearly it appeared to us that all exemptions, other than the property of the Government, were wrong. An exemption is a tax levied on a part of the citizens who have no interest in it, for the benefit of others who have....

....

A certain amount of money must be raised to meet the expenses of the State. If the burden is borne equally by all, it rests lightly on all. If you exempt one piece of property, the sum to be raised remains the same, and you thereby increase the taxes on every other piece of property." 2 *Debates Constitutional Convention 1890,* 2382.

The 1890 Constitutional Convention would never have been held except for the people's desire to protect themselves from legislation providing special privileges and immunities in general, and property tax exemptions in particular:

"[L]ook at the ponderous volumes of private acts passed by our Legislature within the last few years, and enumerate the horde of railroad and other corporations which have been exempted from taxation, and allowed a variety of other special privileges, while battening like vampires upon the substance of the people...." 1 *Debates Constitutional Convention 1890,* 466.

"[E]xcept for the vicious legislation and the local and special laws of all kind and character passed by the Legislatures that have met in Kentucky for the last twenty years, that no proposition to call a Constitutional Convention could ever have received a majority of the votes of the people of Kentucky." 1 *Debates Constitutional Convention 1890,* 1482.

We have been confronted with nonjudicial arguments advanced to uphold this legislation in the face of the constitutional challenge. The essence of these arguments is that the constitutional plan for state property taxes is outmoded and should be circumvented to permit the General Assembly to create *de facto* exemptions to further the state's economic development, and that separate classification and *de facto* exemption of unmined coal "is justified because of its economic importance to the state." The Revenue Cabinet argues that "the framers of the Constitution never imagined that the complex economics of a future day would require more exemptions" than the Constitution authorizes. These arguments are simply beside the point. Our Court must occasionally interpret the Constitution, but where its meaning is clear it has only the duty to enforce it. The Revenue Cabinet's Brief states:

"We have always *freely admitted* that in creating the one mil rates the legislature was probably trying to avoid the *constitutional ban on exemptions.* We make that admission because there is nothing wrong with trying to avoid outdated con-

stitutional provisions." [Emphasis added.]

Neither the General Assembly nor this Court has the power to decide when constitutional provisions are "outdated." This is not a question for the General Assembly to decide in the name of public policy, nor for the judiciary to vote up or down. Constitutional protections and limitations are the law until they are changed by the process of constitutional amendment.

As the trial court so stated, and the Court of Appeals affirmed, the one mil property tax rate when applied to unmined coal in KRS 132.020(5) is an exemption and not a rate, and as such violates our Kentucky Constitution. It is contrary to Sections 174, 170 and 3. Our Courts should declare it so now, in this opinion, rather than leaving the subject open for future debate in the halls of the legislature.

Further, the questions of whether the one mil rate for unmined coal is in fact an unconstitutional exemption and whether the classification was arbitrary and unconstitutional are so interrelated that they cannot be properly decided separately.

STEPHENSON, Justice, dissenting.

The engine that has driven this lawsuit from the beginning to the majority opinion is that out-of-state corporations own large tracts of coal and pay a minimal tax on such property.

I am sure that if it was possible to tax the land-holding corporations at a high rate and leave alone the thousands of relatively small-holding coal owners, we would not have the hue and cry over unmined coal taxes.

Unfortunately, the majority seized upon the "classification of property" issue and did not address the tax rate issue which apparently is the real issue raised in respondents' briefs.

It is also unfortunate that these cases caught a majority of the court in one of its "we know better than the legislature or anybody else" moods.

The result of the majority opinion is to effectively repeal the 1915 amendment to Section 171 of the Kentucky Constitution. If coal is not a reasonable classification under Section 174, then I submit there cannot be a reasonable classification.

From the Kentucky Geological Survey, I find that Kentucky contains 40,409 square miles. The following counties in Eastern Kentucky contain coal deposits: Lewis, Greenup, Boyd, Rowan, Carter, Montgomery, Bath, Elliott, Lawrence, Powell, Menifee, Morgan, Johnson, Martin, Wolfe, Magoffin, Floyd, Pike, Madison, Estill, Lee, Breathitt, Rockcastle, Jackson, Owsley, Perry, Knott, Pulaski, Laurel, Clay, Leslie, Letcher, Clinton, Wayne, McCreary, Whitley, Knox, Bell, and Harlan for a total of 10,400 square miles.

The following counties in Western Kentucky contain coal deposits: Union, Henderson, Daviess, Hancock, Crittenden, Webster, McLean, Ohio, Grayson, Hopkins, Muhlenberg, Butler, Edmonson, Warren, Christian, and Todd for a total of 4,680 square miles and a grand total of 15,080 square miles of Kentucky. This is 37% of the total area of the state. A substantial portion of this is in Eastern Kentucky and has multiple seams. If an area of coal this large is not a reasonable classification under Sec. 171, then there cannot be such a classification.

An expert, a geologist from California, filed an affidavit for the respondents, stating that forty Kentucky counties produce coal. I prefer the figures from the Kentucky Geological Survey.

The majority opinion poses the question of whether a separate tax classification for unmined coal treating it differently from all other interests in real estate, including other interests with similar characteristics such as oil and gas in its natural state, is permissible. The question is answered with the statement that there is no difference between unmined coal and other unmined minerals for purposes of taxation.

This is apparently the basis for the holding of the majority that unmined coal is not a permissible separate classification.

The astonishing conclusion is not based on any argument advanced by the respon-

dents or any authority from this court or geological authority. The parties in the *Moore* case do not argue the separate classification issue. In the *Yount* case, the only argument that unmined coal is not a permissible separate classification is that coal is *real estate*, and real estate is taxed at 31½¢. This argument is supported by authorities that have no application to the issue decided. We have said that when an act of the General Assembly has been attacked as violating the Constitution, "the burden is upon one who questions the validity of the Act to sustain his contentions." *Manning v. Sims*, 308 Ky. 587, 213 S.W.2d 577 (1948), and cases cited therein. Also *Johnson, Governor v. Commonwealth, ex rel. Meredith*, 291 Ky. 829, 165 S.W.2d 820 (1942).

We have not been presented with a reasoned argument regarding the separate classification of unmined coal. I suppose that the majority can make up its own argument, stating that oil and gas have similar characteristics to unmined coal and that there is no difference between unmined coal and other unmined minerals. I am amazed and I am sure that geologists will be amazed at the statement that oil and gas have similar characteristics as coal. As a matter of fact, there are no similar characteristics. The brief in the *Moore* case makes the statement that unextracted oil and gas are both taxed at the same rate as other real property. This may be true in an oil field that has been drilled and proven, or on a tract that producing gas wells have been drilled. However, that is not true as to an undeveloped tract. It is relatively easy to ascertain a tract has coal underlying the surface. The geological surveys have fairly well located the coal measures and the area of the various seams. It is another proposition with oil and gas. Oil and gas do not necessarily remain in place; they are essentially fluids, or like air, that migrate underground. They are affected by rock pressure in the field. While geological surveys can classify large areas as gas or oil fields, if a producing well is not on the property there is no way to accurately tell whether gas or oil is present in an underdeveloped acreage

or now much could be present. The numerous "dry holes" on various properties attest to this, including dry holes drilled near producing wells.

First, the assessor cannot say with certainty that any underdeveloped tract has gas or oil. Even if an educated guess can be made that this tract does have gas and oil, there is *absolutely* no way to *accurately* assess the amount and value. While theoretically oil and gas in such a state are taxable, the practical effect is that there is no tax at all assessed on oil and gas in a tract with no wells.

So much for the "similar characteristics" and different treatment statements. As to other minerals, we are not advised in the record what other minerals, if any, are mined in commercial quantities in this Commonwealth.

The experts in the *Moore* case seem to think that it will be easy to accurately assess unmined coal. The most amazing statement is that there have been purchases of large tracts of minerals in Eastern Kentucky and that "no corporation will commit itself to such a purchase without a thorough knowledge and appraisal of the properties." This expert obviously did not inform himself of all of the financial corpses littering the Eastern Kentucky coal fields after the 70's coal boom had crashed.

In the coal fields of Eastern Kentucky, there are from one to five or more mineable seams underlying the surface; on some tracts the coal of one or more seams are not mineable. The value of the coal seam is affected by thickness of the seam, impurities in the seam, quality of the coal, and mining conditions such as top and bottom formations. It is beyond argument that the above characteristics and quality affect the value of the coal and that the characteristics and quality of a coal seam do change even in small tracts.

I assume that the majority which says that coal must be assessed at the same rate as other real estate would also say that unmined coal is entitled to an accurate assessment as to fair value.

If the majority will agree to this, then I predict a mess. Unmined coal has never been accurately assessed in Eastern Kentucky. With all of the variations as set out and which affect value, I predict that for all practical purposes unmined coal cannot be fairly assessed. I do not believe the state has the available resources or will attempt to commit necessary resources for an accurate assessment. *Dolan v. Land,* Ky., 667 S.W.2d 684 (1984), set out requirements for assessing real property. If this procedure is followed, I do not see how unmined coal on a given tract of land can be accurately assessed. After all, the assessor cannot see under the mountain, nor can he ascertain the quality, etc., which certainly affects value.

I was interested in the amicus briefs filed by the Kentucky Farm Bureau and the Chamber of Commerce. Both organizations have a right to be alarmed and now the majority opinion will effectively invalidate the various properties that the General Assembly has classified separately. They are:

| Property Taxed | Tax Rate Per $100 | Statute |
|---|---|---|
| Livestock and domestic fowl | .001 | KRS 132.020(1) |
| Farm Equipment | .001 | KRS 132.020(1) |
| Agricultural Products | .015 | KRS 132.020(1) |
| Tobacco | .015 | KRS 132.020(1) KRS 132.200(6) |
| Business Inventory | .001 | KRS 132.020(11) |
| Distilled Spirits | .001 | KRS 132.020(10) |
| Motor Vehicles owned by Religious Organizations | .001 | KRS 132.020(12) |
| Domestic Bank Deposits | .001 | KRS 132.030(1) |
| Retirement Plans | .001 | KRS 132.043 |
| Alcohol Production Facilities | .001 | KRS 132.020(1) |
| Tangible Personal Property located in a Foreign Trade Zone | .001 | KRS 132.020(1) |
| Credit Union Accounts | .001 | KRS 132.047 |
| Leasehold Interests in Certain Industrial Buildings | .015 | KRS 132.020(1) |
| Foreign Business Intangibles | .015 | KRS 132.020(2) |

If unmined coal is an unreasonable separate classification, I do not see much hope for the above.

I see by the newspapers that a thoroughbred stallion is syndicated for $35 million or more. This would produce a tax of $3.50 which does not seem to bother the same citizens who protest here. The same rate of .001 applies to tobacco, etc. I await developments.

Finally, *Martin* is cited by the majority as authority. As I read *Martin* the 1915 amendment to Sec. 171 as to classifications is recognized but the case held the right to *classify* did not give the right to *exempt.* The statute in *Martin* contained a specific *exemption. Martin* just does not furnish any authority for the majority holding at all.

This case represents what I consider to be a disturbing trend. People frustrated with inability to convince the General Assembly come to the courts with their problems. We are not wise enough to solve these problems even if we should. The majority goes off on a theory not briefed or argued and a subject about which it knows little or nothing.

I do not comment on the *rate* argument advanced in *Moore,* as the majority seemed to address that issue, but not decide it.

GANT, J., joins in this dissent.